**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

-----------------------------------------------------X

EMILY SOUSA,                                          :
                                                     :
                            Plaintiff,               :     Civil Action No.: 21-cv-00717-SB (CFC)
                                                     :
              v.                                     :
                                                     :     **SECOND** AMENDED COMPLAINT
AMAZON.COM, INC., AMAZON.COM                          :
SERVICES LLC, and LAWRENCE                            :
DORSEY, in his individual and                        :
professional capacities,                             :     **DEMAND FOR JURY TRIAL**
                                                     :
                            Defendants.              :
-----------------------------------------------------X

Plaintiff Emily Sousa ("Plaintiff" or "Ms. Sousa"), by and through her undersigned

counsel, Wigdor LLP, as and for the Second Amended Complaint in this action against

Defendants Amazon.com, Inc., Amazon.com Services LLC (together "Amazon" or the

"Company"), and Lawrence Dorsey ("Dorsey") (collectively, "Defendants"), hereby states and

alleges as follows:

## PRELIMINARY STATEMENT

1.      Jeff Bezos has vowed to make Amazon "Earth's best employer."[1] It is impossible

to approach suchSuch a goal cannot be reached, however, without listening to and following

through on the concerns of your company'swhen male managers are permitted to prey upon

young female employees. and impose negative consequences to drive out of the Company those

who do not go along with their desires.

2.      Emily Sousa was recruited through Amazon's University Operations program for

new graduates and joined Amazon as a Level 4 Shift Manager for one of Amazon's

---

[1] Musadiq Bidar, Bezos vows to make Amazon "Earth's Best Employer", *CBS News* (Apr. 16, 2021),
https://www.cbsnews.com/news/jeff-bezos-amazon-employee-care/.

Pennsylvania facilities straight out of college in mid-2020, overjoyed that she was going to work for a company she had grown up admiring.

3.      On one of her first days of training, a male manager compared her to a specific adult film actress.  This manager also told her that "women are too delicate to work at Amazon."

4.      Ms. Sousa was appalled and could not believe that this was happening immediately upon her embarking on her post-college career.  She told the Company she was resigning, but when she mentioned the reasons for her resignation to Human Resources ("HR") and described the incidents, she was told that she should stay.

5.      Despite the fact that the Company clearly found Ms. Sousa to be credible, it conducted a totally surface investigation.  Amazon's token efforts failed to focus on the correct dates and coulddid not even identify possible male employees who were working that day and may have been the person who harassed Ms. Sousa.  Unfortunately, this lackadaisical and insincere "investigation," which obviously let the male manager off the hook despite these plainly discriminatory and harassing viewpoints, was a preview of what Ms. Sousa would face in a more sustained way at Amazon.

6.      After this sham investigation, Ms. Sousa was moved to a facility in Delaware, where she was required to start her training all over.  Rather than make the effort to get to the bottom of the situation and misconduct, the Company took the easy way out and just shuffled her around.

7.      Defendant Lawrence Dorsey, who eventually became Ms. Sousa's direct manager in October 2020, quickly made Ms. Sousa the target of constant harassment and attempts to cultivatepressure her into a sexual relationship with herhim.

8.     Dorsey made repeated sexual advances toward Ms. Sousa and ~~appeared to fixate~~fixated on Ms. Sousa's Japanese heritage in a barrage of more than a dozen lengthy and unsolicited after-hours personal phone calls~~.~~ over around three months, with at least five lasting over an hour and another four lasting approximately an hour or more than 30 minutes.  These frequent unwelcome personal calls from her supervisor greatly impacted Ms. Sousa's work environment and caused her tremendous stress as she tried repeatedly to fend off her manager's unmistakable sexual designs on her.

~~8.~~9.     Ms. Sousa is an Asian-American woman who was born in Japan.  Another Amazon employee with Asian heritage experienced similar advances from Dorsey and believed that he may have an "Asian fetish."  In fact, Ms. Sousa was told by a colleague that Dorsey had heard about and excitedly mentioned that Ms. Sousa had been compared to an "Asian porn star"—showing Dorsey's specific sexual interest in Ms. Sousa as an Asian woman (the actress to whom Ms. Sousa had been compared was not even Asian—Dorsey added that detail himself). Not only did Dorsey talk at length about his fascination with Japanese culture and tell Ms. Sousa that he wanted to travel to Japan with her so she could be his "guide," in a work context he racially and sexually stereotyped Ms. Sousa by saying that he knew it was "in her nature" to be "polite and non-confrontational."  Dorsey's sexual interest and coercive tactics towards Ms. Sousa were plainly directed towards her protected characteristics as an Asian woman.

~~9.~~10.   By talking with other women working at the facility about her experiences, Ms. Sousa learned that Dorsey had a reputation for flirting with women in the workplace and had a habit of targeting women who were his subordinates.  Dorsey's *modus operandi* of cultivating female subordinates for relationships and "helping" those who he hoped would be or were receptive was well known, as was his habit of making things more difficult for women who did

not play along with his flirtations.  Indeed, Mr. Dorsey did in fact excuse absences and made other allowances for a woman who started dating him in the fall of 2020 and who was among his subordinates.

10.11.  Ms. Sousa was despondent and frightened that thisshe was happening again being targeted sexually as an Asian woman, and she feared retaliation if she raised another sexual harassment complaint, even where the situation clearly called for it.  Amazon had already shown that, when she reported clear misconduct, the Company would go through the motions but that she would bear the burden of the Company's favored "solution" to the issue.

11.12.  After Ms. Sousa rebuffed hisMr. Dorsey's advances for a couple of months, including by repeatedly telling him that she has a boyfriend and was not available to spend time with him alone socially, Mr. Dorsey demoted Ms. Sousa was demoted by three levels in retaliation and sent her to work temporarily at a facility in New Jersey. far from her home, where she was to do physical lifting work as an associate.  In discussing the demotion with Ms. Sousa, Dorsey told underlined the discriminatory and retaliatory animus behind his move by cruelly telling her, "It's humiliating. I wouldn't want to do it – but it can humble people."

13.      Now havingThis demotion, even if supposedly temporary, came at a critical time for Ms. Sousa's promotion prospects, as feedback for promotions was being provided by subordinates during the weeks that Ms. Sousa had been stripped of all her direct reports in Amazon's systems during the critical peak season. Therefore, she would be without key subordinate feedback in connection with possible promotion in the spring of 2021 (which was not at all assured or guaranteed, and she had not been given any promises or representations that she would be promoted).  In addition, Ms. Sousa would miss a crucial opportunity to be observed

by upper management working as a supervisor, which also essentially quashed her chances for promotion.

14.     Dorsey had repeatedly told Ms. Sousa that feedback from direct subordinates was a crucial component of earning a promotion at Amazon.  Being stripped of her direct reports was a substantial detriment to Ms. Sousa's eligibility for and any chance of a promotion to a Level 5 managerial position and substantially delayed any prospect of such a promotion for at least the next year.

15.     Likewise, the observations of higher-level managers also play a key role in obtaining a promotion at Amazon.  Performance during Amazon's "peak season" – roughly from mid-November through Christmas – was particularly important for promotional prospects as higher-level managers typical make and register their observations and recommendations for promotion based upon that season.  Because she was forced by Dorsey to perform entry-level work in a different state, Ms. Sousa was denied crucial exposure and opportunities to demonstrate her strong performance as a Level 4 manager, which also would substantially delay any real chance for promotion to Level 5 (which is a key jump and is referred to reverently by employees as "getting your 5").

~~12.~~16.  Ms. Sousa, at the time of the demotion, was being made ill with severe anxiety under the pressure of her manager's retaliation and discriminatory treatment, and finally feeling as though she had no choice, ~~and experiencing severe anxiety, Ms. Sousa~~ she reported Dorsey's harassment to Amazon HR.  ~~And again~~Again, after a sham investigation was conducted, Amazon quickly announced that it had not found any evidence of harassment and "could not substantiate her claims."  This supposed failure to uncover evidence was despite the fact that Ms. Sousa had spoken with various other female colleagues who also saw that Dorsey targeted female

subordinates sexually, and male colleagues who observed that women who Dorsey was hoping to become involved with were treated favorably.  In addition, Ms. Sousa has learned of at least one other instance of a formal complaint of harassment or discrimination by Dorsey against a female employee.

17. ~~Eventually, the~~The anxiety and physical illness brought on by the serial harassment and fear of further retaliation drove Ms. Sousa to go out on leave for more than seven months ~~before being~~, which prevented her from ever returning to work at the Delaware facility. Among the physical illness brought on by the harassment, discrimination and retaliation were a rash, hives, and a ringing in her ears, and Ms. Sousa's parents noted that she seemingly had become a different person for a time.

18.     Over several weeks during early 2021, during and/or shortly after the close of the HR investigation, Ms. Sousa received many anonymous, harassing phone calls from an individual whose voice appeared to be that of Dorsey.  On these calls, the male voice said things such as "Emily… you know what I want…" and "Have you figured it out yet?"

~~13.~~19.  Due to everything that had occurred and the clear and present danger to her health, Ms. Sousa asked Amazon to transfer her to another facility where she would not have to work with or encounter Dorsey.  Amazon refused, saying (falsely) that she somehow had to first return to work at the same facility where her harasser was a manager before any possible transfer could be discussed or developed.  After trying to work on her health for several months and obtain a transfer away from her harasser, Ms. Sousa was constructively discharged and forced to seek other employment because of Defendants' actions in mid-2021.  ~~Initially, in~~In late 2020, Ms. Sousa had advised Dorsey that she was resigning, but Dorsey, who was visibly nervous about the idea of Ms. Sousa leaving the ~~company,~~Company (as no doubt it would inevitably

bring his conduct to light), suggested that she take a leave of absence instead.  Dorsey's

nervousness also appeared to be brought on by fears that Ms. Sousa would report his relationship

with one of his subordinates.

14.20.  In 2021, Amazon recently had an opportunity to sincerely examine its policies

and practices and enact meaningful change, as Institutional Shareholder Services, a proxy firm,

recommended that Amazon investors vote in favor of an independent racial audit.[2]  The vote,

which took place on May 26, 2021 at the Company's annual shareholder meeting, received only

44% support.[3]  The result is unsurprising, given that Amazon opposed the audit and asked

shareholders to reject it.  Indeed, if Jeff Bezos' Bezos's shares (which comprised about 14% of

the total vote) were removed from the voting, the audit received majority support.[4]

15.21.  Ms. Sousa, therefore, has filed this federal action due to Defendants' conduct,

which violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title

VII") and Section 1981 of the Civil Rights Act of 1866, 42. U.S.C. § 1981 ("Section 1981"), as

well as other federal law.[5]

## ADMINISTRATIVE PREREQUISITES

16.22.  On May 25, 2021, Ms. Sousa filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC") alleging violations of Title VII and the

---

[2] See https://www.seattletimes.com/business/amazon-investors-urged-by-proxy-firm-to-vote-in-favor-of-racial-audit/ (last accessed July 28, 2021).

[3] See https://financialpost.com/fp-work/investors-increase-pressure-on-companies-over-racial-issues (last accessed July 28, 2021).

[4] See https://www.corporatesecretary.com/articles/shareholders/32599/amazon-sees-significant-support-racial-equity-audit-proposal (last accessed July 28, 2021).

[5] This case, filed by Emily Sousa, was filed simultaneously with the cases of other female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon: Diana Cuervo v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, national origin, gender discrimination and retaliation); Tiffany Gordwin v. Amazon, et al. (U.S. District Court, District of Arizona) (race, gender discrimination and retaliation); Pearl Thomas v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, gender discrimination and retaliation); and Cindy Warner v. Amazon, et al. (U.S. District Court, Central District of California) (gender discrimination and retaliation).

~~Delaware Discrimination in Employment Act, Del. Code Ann. tit. 19 §§ 710, *et seq.* ("DDEA").~~

~~On June 9, 2021, Ms. Sousa initiated the Delaware Department of Labor Office of Anti-~~

~~Discrimination ("OAD") charge process by submitting additional documentation required by~~

~~OAD. . As of the date of this Amended Complaint, OAD is in the process of preparing a formal~~

~~Charge of Discrimination.~~

~~17.~~23.  On May 27, 2021, Ms. Sousa received a Notice of Right to Sue from the EEOC.

~~18.    Upon the completion of investigation into Ms. Sousa's charge of discrimination~~

~~by the OAD, and/or the issuance of a Notice of Right to Sue, Plaintiff will seek leave to amend~~

~~this Complaint to add DDEA claims against Amazon.⁶~~

~~19.~~24.  Any and all other prerequisites to the filing of this suit have been met.

## **PROCEDURAL HISTORY**

25.    On May 20, 2021, Ms. Sousa filed a Complaint against Defendants in this Court

alleging violations on Section 1981.[7]

26.    On August 3, 2021, Ms. Sousa filed an Amended Complaint adding claims for

discrimination and retaliation under Title VII.

27.    On December 13, 2021, this Court dismissed Ms. Sousa's Amended Complaint

without prejudice and permitted Ms. Sousa to amend her Complaint on or by January 12, 2022.[8]

---

⁶ ~~Plaintiff expects to receive OAD's Notice of Right to Sue approximately 30 days after OAD notifies Defendants of the formal Delaware Charge of Discrimination.~~
[7] That case, Case No. 1:21-cv-00717-SB, filed by Emily Sousa, was filed simultaneously with the cases of other female employees similarly subjected to unlawful discrimination, bias and retaliation at Amazon: Diana Cuervo v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, national origin, gender discrimination and retaliation); Tiffany Gordwin v. Amazon, et al. (U.S. District Court, District of Arizona) (race, gender discrimination and retaliation); Pearl Thomas v. Amazon, et al. (U.S. District Court, Western District of Washington) (race, gender discrimination and retaliation); and Cindy Warner v. Amazon, et al. (U.S. District Court, Central District of California) (gender discrimination and retaliation).
[8] Case No. 1:21-cv-00717-SB, Dkt. No. 27.

## JURISDICTION AND VENUE

20.28.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and/or local law pursuant to 28 U.S.C. § 1367(a).

21.29.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

22.30.  Plaintiff Emily Sousa is a resident of the State of Delaware.  Ms. Sousa is currentlya former employee of Amazon, where she was employed by Amazon as a Shift Manager.  At all relevant times, Ms. Sousa met the definition of an "employee" under all applicable statutes.

23.31.  Defendant Amazon.com, Inc. is a Delaware-registered domestic corporation with operations in Delaware, Pennsylvania, and New Jersey.  At all relevant times, Defendant Amazon.com, Inc. met the definition of "employer" under all applicable statutes.

24.32.  Defendant Amazon.com Services LLC is a Delaware-registered domestic corporation with operations in Delaware, Pennsylvania, and New Jersey.  At all relevant times, Defendant Amazon.com Services LLC met the definition of "employer" under all applicable statutes.

25.33.  Defendant Lawrence Dorsey is, upon information and belief, a resident of Pennsylvania and currently works for Amazon, where he supervised Ms. Sousa during her

employment at the Company and controlled the terms and conditions of her employment.  At all relevant times, Dorsey met the definition of "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.   MS. SOUSA'S BACKGROUND AND HER POSITION AT AMAZON

26.34.  Ms. Sousa is a Japanese~~-~~ American woman who was born in Japan.

27.35.  In May 2020, ~~she~~Ms. Sousa graduated from the University of Delaware with a degree in Communications.

28.36.  ~~Prior to graduating~~Before she graduated, on May 20, 2020, Amazon offered Ms. Sousa a position as Shift Manager at a starting salary of $50,000.00 per year in addition to a sign-on bonus of $5,500.00.  Ms. Sousa ~~is also~~ was eligible for a second sign-on bonus of $5,500.00 after the one-year anniversary of her start date.  Ms. Sousa ~~is~~was further entitled to Amazon.com, Inc. common stock valued at $29,000.00 subject to the vesting schedule set forth in her offer letter.

29.37.  Ms. Sousa's employment began on June 29, 2020, and she started in-person training on July 6, 2020 at the Company's Harleysville, Pennsylvania facility.

### II.   MS. SOUSA IS SEXUALLY HARASSED DURING HER VERY FIRST WEEK ON THE JOB AT AMAZON AND IS TRANSFERRED TO A DIFFERENT SITE

30.38.  On or around July 8, 2020, Ms. Sousa was training in person at the Company's Harleysville, Pennsylvania facility.

31.39.  When Ms. Sousa met a male manager and shared her name with him, he replied, "Emily . . . like Emily Willis."  Immediately after making this comment, the manager made a face that demonstrated to Ms. Sousa that he knew he had said something he should not have said.

32.40.  Ms. Sousa did not know who Emily Willis was, so she asked, and the manager replied that Willis was "a famous actress."

33.41.  Ms. Sousa later found out that Emily Willis is an adult film star.

34.42.  This manager also told Ms. Sousa that "women are too delicate to work at Amazon."

35.43.  Ms. Sousa continued training at the Harleysville facility until August 12, 2020, when she advised Station Manager Ryan Carrow that she was resigning.  Ms. Sousa spoke with Mr. Carrow on the telephone but did not disclose why she was resigning.

36.44.  On August 17, 2020, HR called Ms. Sousa and asked her to return her laptop. That same day, Ms. Sousa spoke with Mr. Carrow on the telephone.  Ms. Sousa explained that she was resigning because of the sexual harassment she was subjected to, and Mr. Carrow offered to have her reinstated.  Ms. Sousa accepted the offer of reinstatement, however, she was required to switchswitched from the Harleysville, Pennsylvania facility to one in New Castle, Delaware, in order to continue working with Amazon.

37.45.  Ms. Sousa was officially reinstated the day after speaking with Mr. Carrow on August 18, 2020 and was told to stay home from work until August 30, 2020 to recuperate.

38.46.  Before returning to work for training on August 31, 2020 at her new home site, DPH4 in New Castle, Delaware, Ms. Sousa took part in a Chime call with five male managers, including Levi Ray, Aniekan Ukonne, and Mr. Carrow.

39.47.  The managers each took turns describing their positive experiences at Amazon to Ms. Sousa.  To Ms. Sousa, the atmosphere of the call was "cult-like," and she felt as though she had been presented as a case study for them to experiment on with pro-Amazon messaging.

40.48.  Upon returning to work, Ms. Sousa was required to entirely restart Academy training with a six-week training period.

41.49.  The Company assigned Ms. Sousa to an On the Road ("OTR") training, even though she is an Under the Roof ("UTR") manager.  As a result, most of what Ms. Sousa learned at these trainings was inapplicable to her role as a Load Out Manager.

42.50.  On her first day of training, after she had already finished working for the day, Ms. Sousa received a Chime message from the Site Proxy, who was Defendant Lawrence Dorsey, asking that she call him.

43.51.  Ms. Sousa called Dorsey, and he kept her on the phone for nearly an hour despite Ms. Sousa's frequent attempts to end the call.  Ms. Sousa even advised Dorsey that she was busy celebrating her sister's birthday, yet Dorsey would not let her off the phone.  This was the first in a series of bizarre, unwelcome and highly uncomfortable personal phone calls to which Dorsey subjected Ms. Sousa.

44.52.  On or around September 2, 2020, while training at the Company's DJE2 facility in Paulsboro, New Jersey, Ms. Sousa had a meeting in the breakroom with Level 6 manager Alyssa Alvarez to discuss her experience as a woman in Operations.

45.53.  Ms. Alvarez proceeded to speak about the sexual harassment to which Ms. Sousa was subjected at the Company's Harleysville facility in the presence of other employees, which made Ms. Sousa very uncomfortable and was done without asking her whether she was OK discussing the matter in public.

46.54.  Also around this time, Dorsey asked Ms. Sousa about what had happened at the Harleysville facility.  Ms. Sousa told him about the sexual harassment to which she had been subjected.  Despite the sensitive nature of this conversation and Ms. Sousa's expectation that the conversation would be kept private, Ms. Sousa later found out that Dorsey had told a co-worker that a manager at Harleysville had compared Ms. Sousa to an "Asian porn star."  The adult film

actress to whom Ms. Sousa was compared is not Japanese or Asian and Ms. Sousa never told

Dorsey that she was.  Dorsey's factually incorrect elaboration ~~further~~strongly demonstrates his

fixation on Ms. Sousa's <u>Japanese</u> race, ethnicity, and national origin, as ~~discussed~~<u>well as the fact</u>

<u>that these characteristics attracted him to her and made her the target of his harassment and</u>

<u>discrimination, as illustrated</u> in further detail in this Complaint.  Moreover, the coworker who

relayed this story to Ms. Sousa told her that he would be uncomfortable corroborating the story

because he feared retaliation from Amazon and Dorsey.

~~47.~~<u>55.</u>  A coworker told Ms. Sousa that just before she began working at the New Castle

facility, Dorsey saw a photograph of her on Amazon's internal systems.  Upon seeing the

photograph, Dorsey said to the coworker, "She's really pretty, I can't wait to work with her."

<u>This also makes Dorsey's sexual interest in Ms. Sousa clear and provides important background</u>

<u>to his later harassing, discriminatory and retaliatory conduct against Ms. Sousa.</u>

~~48.~~<u>56.</u>  Asian women are frequently sexualized ~~throughout society~~<u>and fetishized based</u>

<u>upon stereotypes and perceptions regarding their physical characteristics and dispositions.</u>  This

has, unfortunately, been an uncomfortable part of Ms. Sousa's everyday life.  She never

expected, however, that she would have to experience this at a company like Amazon, and by her

own supervisor no less.

~~49.~~<u>57.</u>  Moreover, throughout her employment at Amazon's New Castle facility, Ms.

Sousa was frequently asked about her racial and ethnic background based merely upon how she

looked.

~~50.~~<u>58.</u>  In one incident, a man came up to Ms. Sousa and said, "ni hao," a common

greeting in Mandarin Chinese.  Ms. Sousa is not Chinese and does not speak Mandarin.  <u>When</u>

<u>Ms. Sousa arrived at the New Castle facility, several associates excitedly approached her and</u>

shouted to each other, "Oh, the Asian manager is back" and "Michell is back," mistaking Ms. Sousa for an Asian female manager who had left.

51.59.  These events underscore Amazon's lax attitude toward allowing ~~its diverse~~ employees to ~~be treated~~treat colleagues with diverse characteristics as "others" and ~~condoning~~taking insufficient steps to discourage harmful acts of discrimination and harassment against them.

## III.   AMAZON CONDUCTS A SHAM INVESTIGATION INTO THE HARLEYSVILLE HARASSMENT

52.60.  On September 4, 2020, Ms. Sousa received an email from Amazon Central Investigations ("ACI") Senior Investigator Shazana Cochran to set up a meeting on September 9, 2020~~,~~ to discuss the sexual harassment at the Company's Harleysville facility.

53.61.  The investigation ostensibly was largely focused on attempting to identify the male employee who had harassed Ms. Sousa.

54.62.  After speaking with Ms. Cochran on September 9, 2020, Ms. Cochran called again the next day for a short two-minute follow-up conversation.

55.63.  On September 22, 2020, Ms. Cochran called Ms. Sousa to discuss the details of her so-called "investigation."

56.64.  While discussing the preliminary findings, it became apparent that Ms. Cochran focused her investigation on May 2020 – which was before Ms. Sousa's employment with Amazon had even begun – rather than July 2020.

57.65.  To aid in Ms. Cochran's investigation, Ms. Sousa supplied the names of several people she knew ~~to~~who could help narrow down the list of potential harassers.

58.66.  Ms. Cochran called Ms. Sousa again on September 25, 2020, to discuss the investigation.  Ms. Cochran had called from her own cell phone rather than from an Amazon line.

59.67.  Ms. Cochran put forth a list of names of individuals who were the subjects of her investigation.  Of the four names she supplied, two were individuals who Ms. Sousa had already identified as *not* being the individual who sexually harassed her.

60.68.  Ms. Cochran proceeded to tell Ms. Sousa that she was uncomfortable conducting the investigation and said that she was not interested in finding Ms. Sousa's harasser.  Ms. Cochran then stated, "Do you understand what I mean?"  It remains to be determined whether this was intended as a type of warning to Ms. Sousa not to pursue the matter further.

61.69.  Exhibiting common behavior for Amazon's HR department, Ms. Cochran was uninterested in performing her job or intimidated by the prospect of what doing so would mean for her job, preferring to protect the Company and the harassers it empowers by closing the investigation without identifying Ms. Sousa's harasser or even making a concerted effort to do so.

62.70.  Two days later, on September 27, 2020, Ms. Sousa sent a Chime message to Ms. Cochran asking what the next steps were in the investigation and offering to assist.

63.71.  On September 29, 2020, Ms. Cochran sent Ms. Sousa an email stating that the investigation was being closed.

64.72.  Amazon, therefore, closed its supposed "investigation" after investigatinglooking into the wrong month and then identifyingpresenting potential harassers whoto Ms. Sousa who she had already ruled out for the investigator.

65.73.  No one has been disciplined in connection with the clearly sexual and offensive harassment of Ms. Sousa was forced to endureat the Pennsylvania facility, and Amazon made no further efforts to identify Ms. Sousa's harasser.

66.74.  Incredibly, Amazon's investigators gave up on identifying Ms. Sousa's harasser, despite the fact that there could obviously be only a discrete set of employees who were working at the facility during the given timeframe.  It seems highly unlikely, for example, that Amazon could not easily identify the male managers who were working at the facility during the relevant day or week, which could then be used to present the Company and Ms. Sousa with a reliable list of candidates to work through.  Yet, to Ms. Sousa's knowledge, no such effort was made and she was never presented with a viable, reliable set of possible harassers.

## IV.  DORSEY'S DISCOMFITING AND HARASSING CALLS TO AND BEHAVIOR TOWARD MS. SOUSA CONTINUE

67.75.  Dorsey continued to make unwanted personal, harassing calls to Ms. Sousa and also made repeated unwelcome advances that made her feel uneasy and unsafe.  Over the three months dating from August 31, 2020, Dorsey made personal calls to Ms. Sousa on at least fourteen (14) separate days, with at least five sessions lasting over an hour and another four lasting approximately an hour or more than 30 minutes (with Dorsey often calling Ms. Sousa several separate times over the course of these conversations).  These frequent unwelcome personal calls from her supervisor greatly negatively impacted Ms. Sousa's work environment and caused her tremendous stress as she repeatedly rebuffed her manager's obvious sexual interest in her.

68.76.  By way of example only, on August 31, 2020, Dorsey sent Ms. Sousa an unsolicited casual 'selfie' of himself.  He later called Later that day, Dorsey made an unsolicited phone call to Ms. Sousa to ask herthat lasted 52 minutes.  During the call, Dorsey asked Ms.

Sousa what she thought of his haircut, told her that ~~we~~he wanted to "switch it up," and remarked that he had "a lot of grays now from working so hard." ~~Unsure~~Uncomfortable and unsure of how to respond, Ms. Sousa responded, "Yes, I heard you work very hard.  I hope to move up as quickly as you did."  Dorsey then proceeded to brag to Ms. Sousa about the promotion he had recently received.

77. ____ Dorsey also inquired into where Ms. Sousa went to college.  When Ms. Sousa responded that she had attended the University of Delaware ("UD"), Dorsey said that he had never been there and would love for someone to "show him around," making the clear suggestion that he wanted Ms. Sousa to do so and spend time alone with him away from work.

78. In furtherance of this call from a manager, Ms. Sousa was forced to step away from her sister's birthday party for nearly an hour.  At multiple points throughout the conversation, Ms. Sousa stated that she needed to return to her sister's party, but Dorsey would not let her get off the phone and continued to ask Ms. Sousa about personal matters.

79. In furtherance of her attempts to get off the phone, Ms. Sousa told Dorsey that she would let him go because it was getting late.  He responded by telling Ms. Sousa, "You could call me in the middle of the night and I would answer."  Again, it was patently and unnervingly clear to Ms. Sousa that Dorsey's interest in talking with Ms. Sousa was sexual in nature and was not at all merely "friendly."

80. After the call, Dorsey followed up on his desire for Ms. Sousa to "show him around" UD, telling her, unprompted, "I haven't been to UD yet."  Dorsey was unsubtly reminding Ms. Sousa that he wanted to spend time alone together outside of work.  Ms. Sousa, in order to convey clearly to Dorsey that she was not interested in him romantically, told him that perhaps they could go there as part of a group.

~~69.~~81.  On September 12, 2020, Dorsey initiated a barrage of 8 lengthy telephone ~~call~~calls with Ms. Sousa ~~at~~between 7:17 PM ~~on September 12, 2020.  The call~~ and 8:24 PM. Together the calls lasted more than an hour and a half, despite Ms. Sousa's frequent attempts to end the personal ~~call~~calls from a senior employee and manager.

~~70.~~82.  ~~Notably~~Importantly, Dorsey was not interested in talking to Ms. Sousa about their work at Amazon.  Instead, he directed intrusive questions to Ms. Sousa about her personal life and her ~~heritage.~~race, ethnicity and national origin.

~~71.~~83.  Dorsey asked Ms. Sousa questions about her hobbies before steering the conversation toward her Japanese heritage.

~~72.~~84.  Prompted by an apparent desire to discuss her Japanese heritage, Dorsey told Ms. Sousa that he likes anime~~—~~, a type of animation and art that originated in Japan.  ~~He~~ and asked if Ms. Sousa also liked anime.  Ms. Sousa bluntly answered "No," hoping to end the line of questioning and conversation.  Dorsey also conveyed his racially stereotypical belief that Japanese people are "polite and non-confrontational," a common racist stereotype of Japanese people.  Dorsey later went a step further and ascribed these characteristics to Ms. Sousa herself in a work context, showing that he viewed her through the lens of his stereotyped beliefs about her race/ethnicity and national origin.  Ms. Sousa also perceived that this discriminatory belief by Dorsey was only reinforced by the fact that she also is a woman, as he clearly believed that based on her characteristics, she was submissive and could easily be made to do as he said.

~~73.~~85.   ~~He~~Dorsey then began talking about Ms. Sousa's Japanese background and told her that he always hoped to travel to Japan~~.~~, Ms. Sousa's country of origin.

~~74.~~86.  Unsure of how to respond and feeling uncomfortable, Ms. Sousa told Dorsey she could give him an itinerary if he ever did go.  Dorsey replied by telling Ms. Sousa, "I need you to

come with me as my travel guide." <u>Again, Dorsey was openly expressing a desire to spend time alone with Ms. Sousa, and Ms. Sousa responded by dodging, redirecting the conversation and refusing to agree or make plans with him.</u>

75.<u>87.</u>  Feeling even more uncomfortable, Ms. Sousa was able to end the call shortly after this comment.

76.<u>88.</u>  On September 18, 2020, Dorsey initiated ~~yet~~ another ~~long~~<u>series of 8</u> phone ~~call with~~<u>calls to</u> Ms. Sousa. ~~During this call, which~~ <u>that together</u> lasted for ~~about one~~<u>more than an</u> hour ~~and~~.  <u>Although these calls</u> ostensibly began as a work-related ~~call~~<u>conversation</u>, Dorsey ~~again~~ quickly changed the subject and asked Ms. Sousa about her plans for the upcoming weekend.

77.<u>89.</u>  Again, feeling uncomfortable <u>and cornered</u>, Ms. Sousa did her best to end the call as soon as she could.

90.  ~~Ms. Sousa later~~<u>During this series of calls, Dorsey began to dangle the prospect of promotion to Ms. Sousa and suggested he had power to ensure that she would get a promotion and a larger than normal pay increase.  Of course, along with such suggestions always comes the other side of the coin—that if Ms. Sousa displeased him, he also had it in his power to dash her chances of a promotion or raise.</u>

78.<u>91.</u>  Ms. Sousa learned from a co-worker, Shift Manager Ismael Morales-Ramirez, that Dorsey frequently made sexual advances toward the women he managed and gave out his phone number to those women.

79.<u>92.</u>  Mr. Morales-Ramirez told Ms. Sousa that Dorsey had bragged to him that "things were working out between him and an associate he used to manage."  <u>As Ms. Sousa later learned, this associate would soon become Dorsey's girlfriend and receive special treatment.</u>

80.93.  Another employee, Jessica Cusack, described Dorsey as "a total creep" and confirmed that he frequently acts inappropriately toward his female subordinates.

94.     Of the 19 managers at the Delaware DPH4 facility at the time, 16 of them were men, and Ms. Sousa was one of only three female managers.  This lent even more weight and pressure to the male-dominated feeling of the warehouse workplace and aggravated the pressure and threat felt by Ms. Sousa as Dorsey repeatedly pursued her and made discriminatory, stereotyping pronouncements about her and her work.

95.     In early October 2020, Dorsey commanded Ms. Sousa to formally write up an associate, Diana Velasquez, for a safety violation.  Ms. Velasquez had previously rebuffed advances from Dorsey similar to which he had subjected Ms. Sousa, and she told Ms. Sousa that Dorsey and his advances made her feel "uncomfortable."

96.     Ms. Sousa also learned from Mr. Morales-Ramirez that Dorsey had said of Ms. Velasquez, **"She has a fat ass,"** and commented that **"there are so many hot girls"** working at Amazon.

97.     On another occasion, Ms. Velasquez and another woman walked past Dorsey and Ms. Sousa.  Dorsey could not remember Ms. Velasquez's name and asked Ms. Sousa what her name was.  Dorsey made it clear that he was talking about Ms. Velasquez and not the woman she was with by telling Ms. Sousa that he was referring to "the pretty one, not the tomboy one next to her."  This was one of various occasions on which Dorsey made his stereotypical views of women and their worth to him apparent to Ms. Sousa, including in the workplace.

98.     Because Ms. Velasquez had previously rebuffed Dorsey's advances and here Dorsey was telling her to discipline her for violations that others had racked up, too, Ms. Sousa did not feel comfortable disciplining her and refused to do so at Dorsey's behest.  Ms. Sousa

understood that Dorsey was singling out and disciplining Ms. Velasquez solely because she had rebuffed his advances and was commanding Ms. Sousa to do his dirty work.  Her understanding was supported by the fact that there were no photographs of the safety violation Ms. Velasquez had supposedly committed, which would have been commonplace in the issuance of discipline for the type of violation.

99.    Ms. Sousa did not formally write up Ms. Velasquez, choosing instead to speak with her about the alleged safety violation.

100.    On October 14, 2020, Dorsey initiated another unsolicited phone call with Ms. Sousa that lasted 31 minutes.  On part of this call, Dorsey spoke about Ms. Sousa's schedule change to work a different shift.  Dorsey stated that he was doing Ms. Sousa a favor by allowing the shift change and continued to dangle to prospect of promotion in front of Ms. Sousa, telling her to "follow [his] advice" if she wanted a promotion to Level 5.

101.    As noted above, the calls discussed in more detail here are only examples of the many such personal calls and in-person conversations that Dorsey roped Ms. Sousa into, in which he waylaid her for unwelcome discussions about personal matters, including his love life, Ms. Sousa's relationship status, and various outings that Dorsey wanted Ms. Sousa to join him for outside of work.  These unsolicited calls and discussions by Dorsey persisted despite Ms. Sousa repeatedly indicating to him over the course of weeks and months of calls that she was not available and could not join him as he wanted her to do.  Dorsey's solicitations were obvious invitations to go on what would be considered "dates" followed by or involving possible sexual activity or other physical contact, and Ms. Sousa's steadfast refusal to entertain or agree to his invitations are universally understood as a "no" in such situations (go back even farther than the classic "washing my hair" excuse of decades ago).

81.102.        In mid-to-late October 2020, Dorsey became Ms. Sousa's direct manager.

82.103.        Shortly thereafter, Dorsey began ignoring Ms. Sousa's work-related text and Chime messages.  Because Dorsey was her supervisor, Ms. Sousa had to request his assistance with closing out reports and performing volume estimates of incoming packages regularly, but these messages were ignored, and Dorsey offered her no assistance or support.

83.104.        This clearly deliberate cold shoulder approach by Dorsey made it extremely difficult for Ms. Sousa to fulfill her job responsibilities and in itself negatively altered her work environment and constituted disparate treatment of Ms. Sousa based upon his sexual targeting of her as an Asian woman.

105.    Around this time, Ms. Sousa confided in Mr. Morales-Ramirez about Dorsey's advances toward her and his frequent personal phone calls.  Mr. Morales-Ramirez told Ms. Sousa that Dorsey's conduct was part of a pattern in which he solicited relationships with some of the women he supervised.  Mr. Morales-Ramirez also told Ms. Sousa that in or around August 2020, Dorsey had engaged in similar conduct toward Kylie Hagofsky, an Amazon manager-in-training.

84.106.        At one point, Dorsey had complained to Mr. Morales-Ramirez that "Kylie told me she has a boyfriend," which Dorsey correctly understood to mean "Leave me alone." Dorsey therefore knew exactly what he was doing when calling Ms. Sousa and inviting her to come out with him, and Ms. Sousa and Mr. Morales-Ramirez immediately understood his intentions and the negative implications for Ms. Sousa in the workplace.  On October 30, 2020, Dorsey again called Ms. Sousa.  The call lasted more than one hour and had absolutely nothing to do with work.

85.107.        Around this time, Dorsey again dangled the prospect of him "helping" Ms. Sousa to negotiate a promotion to Level 5.  Of course, Ms. Sousa would soon learn that this offer of "help" was only one side of the coin, with the other being negative consequences if she did not go along with Dorsey's wishes of a personal relationship with her.

86.108.        During the call, Dorsey told Ms. Sousa that he was "in Lancaster with a friend," seemingly referring to a romantic assignation.

87.109.        Around early November 2020, Ms. Sousa learned that Dorsey secretly was dating the associate he had bragged about to Mr. Morales-Ramirez. (i.e., the female subordinate who Dorsey told Mr. Morales-Ramirez that "things were working out" with).

88.110.        Around the time Ms. Sousa learned that Dorsey was dating an associate, Dorsey stopped helping Ms. Sousa at work and ignoredbegan ignoring her work-related calls and textscommunications.  On three or four occasions, he made up pointed excuses for ignoring her such as, "I was busy with a friend."  This was Dorsey blatantly communicating to Ms. Sousa that, since she had not given in to his advances and desire for private time with her, she was not his "friend", and therefore, would not be getting his assistance or attention.

89.111.        Dorsey also, however, began to call Ms. Sousa to ask for her advice with his girlfriend – asking for things like restaurant suggestions and how to get her to "open up" more.  He continued to keep his girlfriend's identity a secret from Ms. Sousa, even though Ms. Sousa already knew that he was dating an Amazon associate and who that associate was (though Dorsey seemed unaware she had this knowledge).

90.112.        This was in keeping with what Ms. Sousa heard from a male associate, who Dorsey talked with about how he could get his Amazon associate girlfriend to be more receptive to sex and engage in specific sexual acts.  After growing tired withexhausted by

23

Dorsey's <u>repeated</u> requests for <u>girlfriend</u> advice and his efforts to hide the nature of his <u>improper</u> <u>workplace</u> relationship, Ms. Sousa asked Dorsey how he had met his girlfriend.  After an awkward silence, Dorsey laughed, quickly changed the subject, and began to talk about the "bond" he had with his girlfriend.

~~91.~~113.        Ms. Sousa became concerned by Dorsey's conduct and confided in Mr. Morales-Ramirez, who told her, "It's probably better to kiss up to him.  Lawrence [Dorsey] told me to kiss up to Ryan [Carrow], and Lawrence probably wants that, too."  After this conversation, Ms. Sousa made sure to constantly thank Dorsey, apologize to him, and praise him because she was afraid <u>that</u> he would <u>further</u> retaliate against her.

~~92.~~114.        Ms. Sousa witnessed Dorsey giving his girlfriend special<u>, favorable</u> treatment at work on several occasions.  For example, she was frequently permitted to abandon her work responsibilities to spend time with Dorsey.

<u>115.     Dorsey assigned his girlfriend, a Level 1 associate, to wear a maroon "Process Guide" vest, which indicated that an employee had a higher status than the yellow vests typically worn by associates.  The maroon vest is typically given for strong performance and usually given to Level 2 associates shortly before expected promotions to Level 3 shift assistant positions. Maroon vest associates are given extra responsibilities and are frequently relied on by Level 3 shift assistants and Level 4 managers to help out with additional tasks beyond those expected of most Level 2 associates.  This practice also flaunted to Ms. Sousa and other women the fact that those who went along with Dorsey's desire for personal, including sexual, relationships would be rewarded, whereas those who did not would not receive such advantages and could, in fact, suffer negative consequences.</u>

116.    To be sure, Dorsey's girlfriend did not earn her maroon vest as other Level 2 associates had to do.  It was apparent to those in the know that she was given her vest solely because she was Dorsey's girlfriend.  In fact, her performance was sorely lacking and other associates pointedly wondered aloud how she had received her vest and why it had not been taken away from her.

117.    The maroon vest ensured that Dorsey's girlfriend would be in line for a promotion to Level 3.  Of course, in his advances to Ms. Sousa, Dorsey had dangled the prospect of promotion and the favoring of this female employee was no doubt a part of the same pattern of behavior.

93.118.    Ms. Sousa was also told by a co-worker that Dorsey adjusted his girlfriend's timecard to account for missed shifts.

94.119.    At one point, Ms. Sousa sent Dorsey a "selfie" of her with her then-boyfriend, hoping he would abandon or at least tone down his advances.  Dorsey, unfortunately, did not take the hintrelent.

95.120.    During Dorsey's long phone calls to Ms. Sousa, which often would typically occur while Dorsey was driving home from work, Ms. Sousa would say, to try to diplomatically end the phone call, "I'm sure you are busy, I'll let you get back to work," or "I'm sure you've had a long day, don't you want to listen to music on your trip home?"  Dorsey respondedwould respond, "We don't just have to talk about work."

96.121.    Dorsey also repeatedly raised the possibility of hanging outspending time with Ms. Sousa outside of work – a clear demonstration that he was interested in a romantic and sexual relationship.  Ms. Sousa made it clear to Dorsey that she was only interested in hanging out outside of work in a group situation and emphasized that she was in a serious relationship.

This was a clear rebuff of Dorsey's advances.  Notably, Dorsey demonstrated that he understood such rebukes to mean that a woman is not interested when he complained to Mr. Morales-Ramirez that Ms. Hagofsky had told him she had a boyfriend in response to his advances.

97.122.      Unfortunately, Ms. Sousa learned throughout her employment that this predatory, quid-pro-quo behavior was commonplace for Dorsey.  This conduct by Dorsey towards other women also had a pronounced negative impact on Ms. Sousa's work environment and the pressure she felt on herself by Dorsey, as she saw that in order to advance and be supported under her supervisor one might have to give in to his advances.

98.123.      In speakingtalking about Dorsey with others, one of Ms. Sousa's subordinates said, "I really don't like him.  He makes me feel uncomfortable."  Ms. Sousa suggested the co-worker report the situation to HR. if she felt that way.  The co-worker replied, "No, I really don't want to do that."

99.124.      Another co-worker, Huyen "Holly" Bowers, a Shift Assistant, who is of Vietnamese heritage, described similar advancesbehavior from Dorsey.  The co-worker told Ms. Sousa that Dorsey frequently called her and insisted on discussing her personal life.  The co-worker also despite the fact that she was married.  Ms. Bowers told Ms. Sousa that she wondered whether Dorsey had an "Asian fetish."

100.125.      Ms. Sousa, based upon Dorsey's steering the conversation subjects,towards her racial/ethnic and national heritage and his apparent excitement that she had been compared to an "Asian porn star," also believed that he had chosen her for harassment and cultivating a personal, sexual relationship due to her race as an Asian-American of Japanese descent.

101.126.      In another incident, Ms. Sousa witnessed a conversation between Dorsey and a Black male associate who had been passed up for promotion.

102.127.      Following the conversation, Ms. Sousa had a separate conversation with the associate and told him that she would keep an eye out for open positions and let him know about opportunities for advancement.

103.128.      The associate thanked her and, but told her that Dorsey, "Doesn't care about me.  He only wants to help the girls out."  Indeed, employees also voiced their opinion to Ms. Sousa that white managers were promoted more quickly than non-white managers at the facility, and that although one did have to be hardworking and efficient to be promoted, non-white managers generally had to volunteer for additional projects and make other special efforts to be noticed and advance.  These opinions were in keeping with Ms. Sousa's own personal, firsthand observations as well.

104.129.      Dorsey's constant harassment of Ms. Sousa caused her to experience extreme anxiety that manifested in physical symptoms.  Around this time, her family also noticed that she was behaving differently and was quieter than normal.

105.130.      Ms. Sousa's anxiety was driven in part by the fact that she felt extremely comfortableuncomfortable and apprehensive about reporting Mr. Dorsey to Amazon.  Specifically, she feared retaliation by Dorsey and the Company if she reported his harassment, especially in light of the fact that she had already once reported sexual harassment and Amazon closed the investigation without even identifying a suspect and required her to transfer to a new facility to keep her jobplausible suspect.

106.131.      Despite Dorsey's predatory behavior, he was promoted from Level 5 to Level 6 on or about December 6, 2020.  This further ratified the Company's tolerance of his

conduct in the eyes of Ms. Sousa, particularly as his modus operandi of preying on female

subordinates was apparent to those who she talked with at work.

**V.      MS. SOUSA IS DEMOTED BY THREE LEVELS AFTER <u>STEADFASTLY</u> <u>REFUSING TO</u> ~~ENTERTAIN~~<u>GIVE IN TO</u> DORSEY'S ADVANCES**

~~107.~~<u>132.</u>          Throughout October and November, Dorsey placed pressure on Ms. Sousa

to discipline associates more harshly.

~~108.~~<u>133.</u>          Specifically, Dorsey told Ms. Sousa that she was "too soft" and although

he knew it was "in her nature" to be "non-confrontational," she needed to write up more

associates.  Dorsey therefore had again utilized the stereotype of Japanese people being "polite

and non-confrontational," now <u>in a work context</u> as ~~ammo~~<u>ammunition</u> against Ms. Sousa to

criticize her performance because of her Japanese "nature."

~~109.~~<u>134.</u>          Ms. Sousa ~~followed these directions~~<u>complied</u> and began to "write up"

employees more frequently and in the manner that Dorsey instructed her.  This led to HR

advising Ms. Sousa that she was not writing up employees the correct way, despite following

Dorsey's specific instructions.

~~110.~~<u>135.</u>          Ms. Sousa is not aware of Dorsey telling any other managers to write up

more employees or that they supposedly were too nice.  This was, no doubt, ~~the result~~

~~of~~<u>attributable to</u> Dorsey's stereotyped view of Ms. Sousa as a "polite and non-confrontational"

Japanese woman.

<u>136.     In mid-November 2020, Mr. Carrow and Dorsey approached Ms. Sousa to ask if</u>

<u>she would be willing to permanently move to a new Amazon facility.  Ms. Sousa ultimately</u>

<u>declined the transfer because the facility was far away and she was not offered relocation</u>

<u>expenses.</u>

137.    Ms. Sousa later learned, however, that Michael Fanelli, a white male Level 4 manager, was offered a promotion to Level 5 if he accepted the transfer.  This opportunity was not offered to Ms. Sousa, even though she began working at Amazon several months before Mr. Fanelli.

138.    Mr. Fanelli accepted the transfer to the new facility and was given a promotion by Dorsey and Mr. Carrow.  At this time, Dorsey and Mr. Carrow also promoted Aaron Kalish, another white male, to Level 5.  Messrs. Fanelli and Kalish, both white males, were the only people promoted to Level 5 around this time.

~~111.~~139.         On November 20, 2020, Ms. Sousa was demoted (temporarily ~~demoted,~~ she was told) from Level 4 to Level 1 and reassigned to the Company's Swedesboro, New Jersey facility, ostensibly due to low headcount at one of Amazon's New Jersey facilities.

~~112.~~140.         Ms. Sousa initially found out from a co-worker that she was being demoted.  Later that day, Ms. Sousa confronted Dorsey about the demotion.  She was upset that all of her co-workers seemed to know about her demotion, and that somehow she was the last to know about it.  Ms. Sousa told Dorsey, "I need a manager more than I need a friend," and advised him that in the future she wanted to be the first to know about his and Amazon's decisions about her.

~~113.~~141.         Ms. Sousa asked Dorsey whether she was at risk of losing her job, and he told her that she was "doing fine" (which seemed strange considering the demotion) and that he was planning on firing another manager.

~~114.~~142.         Dorsey then proceeded to discuss the performance of all of Ms. Sousa's co-workers.  After saying, "I really shouldn't show you this," he showed Ms. Sousa a portal that

contained the anticipated (though by no means guaranteed) promotion dates for everyone he supervised.

~~115.     Ms. Sousa's anticipated promotion date was shown in the portal as March-May 2021.~~

143.     ~~Dorsey then advised Ms.~~ Ms. Sousa's anticipated promotion date was shown in the portal as March-May 2021.  This was roughly in-line with the boilerplate timeframe provided in Ms. Sousa's offer letter, which stated that she would be "eligible for a performance assessment and compensation adjustment in calendar year 2021.  Ordinarily this process occurs in April."  (emphasis added).  Notably, the offer letter does not guarantee any promotion or raise, but rather states that Ms. Sousa would merely be *eligible* for one.  Moreover, the offer letter makes clear that this is simply the first time that Amazon would consider such a move for a given employee, and this was not unique or tailored to Ms. Sousa (as Dorsey appeared to be trying to suggest, perhaps by way of misleading and soothing Ms. Sousa).

144.     At any rate, despite this supposed promotion timeline, Ms. Sousa never did receive any promotion.

~~116.~~145.          Dorsey then advised Ms. Sousa to stop being kind to her subordinates and that~~,~~ if she "wrote them up," they would become more productive because "they'll be intimidated by you."  Again, this perception of Ms. Sousa was no doubt a result of Dorsey's prejudiced view of her as a "polite and non-confrontational" Japanese woman.

~~117.~~146.          During the meeting, Ms. Sousa told Dorsey that she was disappointed about the demotion and about being sent to New Jersey.  He warned her that among the employees considered for demotion, she purportedly was "the obvious choice."  Dorsey told Ms. Sousa that the choice for demotion supposedly was between her, Dana Dockery, a black woman,

and Mike Clugston, a white male, but that he did not want to demote Mr. Clugston and send him

to New Jersey because ~~he planned to promote him.  He then stated~~Dorsey (her harassing

supervisor) did not want to interfere with the potential promotion of that male colleague.  He

then claimed that sending Ms. Sousa was "the only option" as far as who would have to go to

New Jersey and be "an overpaid associate."  Upon information and belief, Dorsey ~~did~~had not

~~make~~made sexual advances toward Ms. Dockery.

147.    Notably, there was no imminent promotion planned for Mr. Clugston and this

promotion was not guaranteed.  In, fact, his projected promotion timeline was roughly the same

as Ms. Sousa's and he was not actually promoted until Spring 2021.

148.    Moreover, Dorsey's admission that he did not want to hurt Mr. Clugston's

chances of promotion was a direct acknowledgment and admission that the demotion *would* in

fact harm, if not sink entirely, Ms. Sousa's chances of a promotion, or those of anyone else

subjected to the demotion.

149.    Dorsey had deliberately chosen to harm the chances of promotion for Ms. Sousa,

a Japanese woman who had rebuffed his advances, rather than those of Mr. Clugston, a white

male, or another female colleague who he seemingly had not approached.

~~118.~~150.     Only one other employee – who was known to be a poor performer – was

sent to New Jersey.  ~~This~~That employee, among other things, had fallen asleep during training

and continued his poor performance.  Ms. Sousa was alarmed that she was being sent to New

Jersey with just one other employee who was such an established poor performer.  She raised

this to Dorsey and he acknowledged that the other employee was "not strong."

151.    Of course, despite Dorsey's statement that he had to choose between only a few

employees for demotion, there were, in fact, many employees who could have been demoted,

including employees at Levels 1-3, as well as other Level 4 managers such as Mr. Morales-Ramirez and Brandon Hess (among just two examples among many Level 4 managers with similar seniority to Ms. Sousa).  Indeed, Mr. Hess, a white male, had identical seniority at Amazon to Ms. Sousa.

152.    Likewise, given that the work to be performed at the New Jersey facility was Level 1 work, it would have been entirely possible (and more efficient) to send a Level 1 or 2 associate rather than demoting Ms. Sousa.

153.    Indeed, Ms. Sousa asked Dorsey why he didn't simply send a Level 1 associate to New Jersey.  He replied that Amazon had "tried that" and it was "too complicated" so it was "easier to send a manager."  Ms. Sousa relayed this explanation to Mr. Morales-Ramirez who called it "a load of crap."  Dorsey's explanation is not believable, and Ms. Sousa is not aware of any other instances of managers being demoted in this manner.

119.154.    Ms. Sousa's demotion also came during the holiday season – Amazon's busiest time of the year and the time that is most significant in evaluating whether employees will be promoted.  For this reasonsreason, the demotion denied Ms. Sousa an opportunity to be considered for promotion on the same terms as her colleagues and damaged her ability to be promoted in general, as she would be away from her home facility and performing tasks well below her managerial level.

155.    By demoting Ms. Sousa to a position in which she would not be supervising anyone, Dorsey severely harmed Ms. Sousa's opportunities for promotion.  Specifically, Amazon promotions are largely based on performance reviews created by the employees being supervised.  If Ms. Sousa did not have anyone to supervise, it would substantially limit her ability to be promoted.

156.    In fact, Dorsey was well-aware of the importance of subordinate reviews.  On multiple occasions throughout Ms. Sousa's employment, Dorsey pressured her to give him good reviews and once called her to explain the importance of these reviews.  Ms. Sousa understood that Dorsey was intimidating Ms. Sousa to give him good reviews.

157.    Dorsey also explained to Ms. Sousa that good reviews from his subordinates were crucial for his own chances of being promoted to Level 6.

158.    Likewise, at the end of the peak season, all of the managers gather together to give each other feedback on their performance through the busy holidays.  These discussions also have a significant impact on promotional opportunities and Ms. Sousa was again denied the chance to be present to prove her worth, therefore harming her chances of promotion.

120.159.    Dorsey further advisedsaid to Ms. Sousa that she did not need to go to New Jersey if she did not want to, but he already "gave her name to the site lead," and "it would look bad" if she did not go, strongly suggesting in tone and word that it was already done, and that she did not actually have a choice in the matter if she was going to stay in her job.

160.    BelievingSeeing that she had no other choice and seeing noor real alternative, Ms. Sousa acquiesced to the demotion.

121.161.    Dorsey also wistfully and cruelly commented to Ms. Sousa about the demotion that, "It's humiliating. I wouldn't want to do it – but it can humble people."  This decisively confirmed the retaliatory and discriminatory motivation behind her selection for demotion by Dorsey.

122.162.    When Ms. Sousa emerged from the meeting with Dorsey, she was visibly shaken, and Shift Assistant Jess Cusack approached her to ask if she was okay.  Ms. Sousa replied that she did not know what to think about Dorsey.

123.163.    Ms. Cusack stated that she had heard that Dorsey does not treat female employees well unless he "has a use for them," and that he was talking to several women at work, including the female Driver Trainer.

164.    Ms. Cusack, a Level 3 employee, had previously made her displeasure with Amazon management, and Mr. Carrow specifically, well-known and had complained to Amazon HR about Mr. Carrow.  Dorsey himself had noted that Cusack was among their very best employees.  However, once Ms. Cusack had complained about Mr. Carrow to HR, she was treated unfavorably by management.

165.    Ms. Cusack interviewed for a Level 4 position and was told she was not ready for promotion, despite being an outstanding employee.  This was, no doubt, retaliation for Ms. Cusack's complaint against Mr. Carrow.

166.    Another employee, a Shift Assistant named PJ Redmond, told Ms. Sousa that he thought it was "messed up" that she was being demoted.

167.    Other employees also expressed that they thought Ms. Sousa's demotion was "not right" or "unfair."  Many of these employees also expressed that they were relieved they were not the ones being demoted.  This also illustrates that to all appearances any number of other people also could have been sent to the New Jersey facility temporarily, far beyond the three people who Dorsey claimed he supposedly had to choose from.

168.    After meeting with Dorsey, Ms. Sousa sent a Chime message to her mentor at Amazon, Russ Morrison, who had been one of her instructors during training.  Specifically, Ms. Sousa told Mr. Morrison that Dorsey was sending her to a new site to perform Level 1 work and asked, "Is this a typical request of a new manager?"  Ms. Sousa also stated her belief that the demotion would "set [her] back" for her Level 5 promotion.  Mr. Morrison never responded.

169.     Ms. Sousa frequently reached out to Mr. Morrison to ask him questions about Amazon and her employment.  This was the only time he did not respond.

170.     Later that night, after working hours, Dorsey initiated another lengthy telephone call with Ms. Sousa that lasted one hour and 40 minutes.  Dorsey stated he was calling Ms. Sousa "to check up" on how she was doing.

171.     On November 24, 2020, while Ms. Sousa was assigned to the New Jersey facility, Dorsey again called Ms. Sousa 4 times, totaling 51 minutes.

172.     On her very first day at the New Jersey facility, Ms. Sousa told the associate working next to her that she was a Level 4 manager but had been assigned to perform Level 1 work in this New Jersey facility.  The associate, clearly understanding the implications of the demotion, responded, "Damn, that sucks."

~~124.~~173.     Nearly every day during which Ms. Sousa was required to work as a Level 1 employee in New Jersey, she was sent home early because the facility had enough workers.

~~125.~~174.     While working in the New Jersey facility, Ms. Sousa was required to perform far less desirable work duties at far less desirable hours.  While working at the New Jersey facility, Ms. Sousa was required to perform arduous and repetitive physical labor for hours on end, including but not limited to lifting packages, sorting packages, bringing delivery bags (called "routes") to drivers during heavy volume, and removing packages from conveyer belts and organizing them for other associates.  These manual Level 1 job duties were ~~far~~completely different from her usual Level 4 management duties, which involved supervising associates, running audits, and ensuring that the facility was running smoothly.

~~126.~~175.     Although Ms. Sousa was a day shift manager in the New Castle facility, she was required to work an overnight shift, beginning at approximately 11:00 p.m. in New

35

Jersey (as compared with her normal daytime shift in Delaware).  Moreover, her commute to the New Jersey facility was double the length of her usual commute.  In fact, the commute was so far that Amazon offered to pay for Ms. Sousa to stay in a hotel, rather than sleep in her own bed.

127.176.    Ms. Sousa was confused and frustrated by the fact that she was told she was not needed in New Jersey and began to believe that Dorsey and the Company – the actions of which were based almost entirely on Dorsey's input and perspective – waswere trying to force her to resign.

## VI.    MS. SOUSA TAKESIS COMPELLED TO TAKE A LEAVE OF ABSENCE DUE TO THE STRESS AND DETERIORATING HEALTH CAUSED BY DORSEY'S DISCRIMINATION, HARASSMENT AND RETALIATION

128.177.    In or about October 2020, Ms. Sousa began experiencing extreme stress as a result of Dorsey's constant harassment.

178.    The stress was so severe that Dorsey's constant harassment of Ms. Sousa experiencedcaused her extreme anxiety that manifested in physical symptoms.  Around this time, her family also noticed that she was behaving differently and was quieter than normal.

129.179.    Ms. Sousa's demotion caused her anxiety to intensify further, and her physical symptoms – including a rash, hives, and a ringing in her ears – that required medical attention. also worsened significantly.

180.    Ms. No longer able to deal with the intense anxiety and her worsening health, Ms. Sousa was visited her primary care physician for treatment.  Her doctor then referred her to a psychiatrist who she began seeing and continues to see on a monthly basis.

181.    Ms. Sousa's psychiatrist prescribed two medications to combat her symptoms of anxiety and continuesdepression.

130.182.    In addition to seemonthly visits with her psychiatrist, Ms. Sousa also sees a therapist regularlyon a monthly basis to deal with the emotional distress caused by theDorsey's

constant harassment, her demotion and other retaliation, and Amazon's refusal to do anything

~~about~~to address the situation or make it so that she could return to work safely.

~~131.~~183.        Ms. Sousa's level of stress increased significantly after her

~~banishment~~removal and demotion to the New Jersey facility and Level 1 role.

~~132.~~184.        Upon ~~returning~~being scheduled to return to work in Delaware from New

Jersey, Ms. Sousa sent Dorsey a Chime message on December 1, 2020, advising him that she

intended to resign.

~~133.~~185.        After receiving Ms. Sousa's Chime message, Dorsey called Ms. Sousa.

He stated that he called to discuss ~~her~~Ms. Sousa's resignation and asked her to consider taking a

leave of absence instead.

~~134.~~186.        When Dorsey asked why Ms. Sousa wanted to resign, she told him that it

was due to stress from being demoted, having her demotion shared with others, and having her

confidential information shared.  Although Ms. Sousa did not ~~tell~~say it to Dorsey, his behavior –

including, but not limited to, his persistent sexual advances and his decision to demote Ms. Sousa

– was ~~her~~the primary motivating factor in her decision to resign.

~~135.~~187.        On this call, Dorsey ~~asked~~once again shifted the conversation from work

to Ms. ~~Sousa~~Sousa's personal life.  Specifically, Dorsey inquired about ~~her~~Ms. Sousa's

boyfriend at the time and asked, "How available are you?"  When Ms. Sousa asked what he

meant by that, he responded, "I don't know how serious you and your boyfriend are, I was just

asking."

188.    Ms. Sousa began to experience extreme anxiety as a result of Dorsey's

inappropriate inquiries, particularly after his open retaliation against her, and began to cry.

Dorsey then said that he was asking these personal questions for a "friend," though it still was

clear that Dorsey was inquiring for himself.  At this point, Ms. Sousa ~~became extremely anxious~~provided only short answers to mask her crying and wanted nothing more than to end the call.  ~~Perhaps~~This conduct made it all the more obvious that Dorsey would not relent and that Ms. Sousa had to seek assistance in dealing with this treatment and the situation.

~~136.~~189.     Dorsey asked Ms. Sousa how she felt about dating this supposed "friend," but, perhaps sensing ~~Ms. Sousa's anxiety, Dorsey then~~that he was pushing Ms. Sousa harder than he wanted to at that point, turned ~~back~~the conversation to Ms. Sousa's leave of absence and ~~advised~~told her that the leave would be unpaid.

190.    Once Ms. Sousa regained her composure, Dorsey said to Ms. Sousa, "Tell me you will consider it," supposedly about dating his "friend."  This was stated as a command, not a question, and Ms. Sousa understood and fully felt the pressure Dorsey was placing on her.  Dorsey also demanded, "Will you think about it?  Tell me you'll think about it.  Because he's really into you."  Before hanging up, Dorsey stated, "I'll call again to check on you.  You sound stressed."

~~137.~~191.     Dorsey called again on December 4, 2020 to ~~update~~tell Ms. Sousa ~~on~~about her leave status.  He told her that her leave would begin on December 8, 2020, and that she should use her accrued paid time off ("PTO") days for December 1, 2020 through December 7, 2020.

~~138.~~192.     ~~He then~~Unbelievably, Dorsey yet again inappropriately turned the conversation back to Ms. Sousa's personal life and asked about her plans with her boyfriend at the time when he returned from the military.

193.    Ms. Sousa later learned that, also in December 2020, Dorsey had urgently asked a male colleague, "Did you say anything to Emily?  Did you tell Emily about [the name of the

female employee who Dorsey was dating]?"  The male employee told Dorsey that he had not out of fear for his job and other retaliation.

## VII.   AMAZON CONDUCTS A SECOND SHAM INVESTIGATION AND CONSTRUCTIVELY DISCHARGES MS. SOUSA

139.194.        On January 11, 2021, Ms. Sousa contacted HR Manager David Markman regardingto report Dorsey's behavior.  Ms. Sousa was particularly afraidhad to overcome a lot of fear to file an HR complaint against Dorsey because she fearedbelieved he would further retaliate against her.  Moreover, having already filed a previous HR complaint for sexual harassment, Ms. Sousa was well aware of Amazon's systemic refusal to properly investigate such complaints and feared reprisal.

140.195.        That very night, Ms. Sousa received a text message from Dorsey saying, "Hey Emily how are you?"

196.     Shortly after Ms. Sousa complained to HR, Dorsey confided to a male colleague that he was worried he would be fired.  He disclosed that Ms. Sousa's complaint against him was not his first and that a woman at the Amazon facility in King of Prussia, Pennsylvania had previously filed an HR complaint against him.  Ms. Sousa was told that Dorsey had commented, "Emily reported me.  I had to give HR my phone and text records.  It's embarrassing… That girl at DPH2 [King of Prussia] reported me and now Emily is, too.  I'm going to be fired."

141.197.        On January 12, 2021, Ms. Sousa received an email from ACI Investigator Mike Williams, who introduced himself as the investigator on her claims against Dorsey.

142.198.        On January 15, 2021, Ms. Sousa spoke for about two hours over the phone with Mr. Williams.  During the call, Mr. Williams requested that Ms. Sousa send him screenshots of text and Chime messages with Dorsey and phone records showing the calls with him.

143.199.        On February 17, 2021, Ms. Sousa sent Mr. Williams the materials he requested and ~~requested~~asked for an update on the investigation.  Mr. Williams did not respond, so Ms. Sousa sent a follow-up email on March 1, 2021.

144.200.        On March 4, 2021, Ms. Sousa had a follow-up call with Mr. Williams in which he asked her additional questions.  Mr. Williams requested that Ms. Sousa create a timeline of events, which she then created and sent to him on March 12, 2021.

201.    Over the course of their "investigation," Amazon spoke with Mr. Morales-Ramirez.  After Mr. Morales-Ramirez spoke to HR, several white male Level 6 managers pulled him aside in an office and asked what he had told HR.  This was no doubt an attempt to intimidate him in order to ensure that anyone else interviewed would not speak against Dorsey lest they be subjected to retaliation.

145.202.        On March 18, 2021, Mr. Williams emailed Ms. Sousa to notify her that he had concluded his investigation.  He invited her to join a call to discuss his findings.

146.203.        The call took place on March 19, 2021, and Dina Horvath and HR Business Partner Deanna Stephens joined the call, in addition to Mr. Williams.

147.204.        Mr. Williams advised Ms. Sousa that all of her claims against Dorsey were unsubstantiated.  Specifically, he stated that he was not able to substantiate that Dorsey sexually harassed her.  Mr. Williams also stated he could not substantiate that Dorsey was engaged in a relationship with another associate, despite this being well-known information within the Company.

205.    This transparently was an attempt to help mitigate the Company's liability and/or to dissuade Ms. Sousa from taking further action, as the facts of Dorsey's actions were well-established and he had engaged in similar conduct with various female employees.  In addition,

for Amazon to state that no harassment took place, even under its own policies, which do not require that harassment rise to any particular legal standard, reveals the insincerity and falsity of the findings.

148.206.    Ms. Sousa was further advised that when her leave of absence ended, she would be required to return to work at the same facility where Dorsey worked.

149.207.    The Company advisedclaimed to Ms. Sousa that she could not apply for a transfer to a different facility while she was on leave and that she could do so only after returning to work.  Nonsensically, Ms. Sousa was told that this was the Company's policy out of "fairness" to other employees.  During this call, Ms. Sousa wasfound herself physically shaking at the thought of Amazon requiring her to return to work with the man who had continuously harassed her for months, had blatantly retaliated against her for not giving in to him, and about whom she had already complained to HR.  This greatly increased the anxiety Ms. Sousa felt at the thought of returning to work with Dorsey.

208.    Ms. Sousa would have been forced to see and interact with Dorsey during overlapping shifts and, as her superior, he would have retained a significant degree of control over her employment.

209.    In fact, throughout Ms. Sousa's leave, Dorsey continued to be listed as her manager in all HR documents.  This was true until Ms. Sousa's very last day at Amazon.

150.210.    Amazon's gratuitously inflexible, cold response to Ms. Sousa's reasonable request to be transferred to a new facility has only increased the anxiety and pressure Ms. Sousa iswas under.  It iswas baffling to Ms. Sousa that Amazon believescould truly believe that Ms. Sousashe should be forced to continue to work at the same facility where she was subjected to

harassment and where her harasser continues to work (and even supervise her) before she ~~can~~could request a transfer~~.~~ (with no guarantee as to when or if it would happen).

211.   ~~As a result of the enormous anxiety Ms. Sousa experienced because of~~This refusal by Amazon to allow her to seek a transfer appeared particularly retaliatory and dishonest due to the fact that she previously had been allowed to transfer to a new facility without returning to the site where she previously worked.  Indeed, employees were quickly transferred and shuffled around all the time, as also evidenced by her demotion.

~~151.~~212.   The enormous anxiety Ms. Sousa was already under was exacerbated by Amazon's requirement that Ms. Sousa return to the same facility where Dorsey, her harasser, worked, and Ms. Sousa had extended and continued to extend her leave on the advice of her medical care provider on several occasions.  Indeed, because of this anxiety, Ms. Sousa's doctor repeatedly over the course of months deemed her to be unable to return to work at Amazon because of the immense anxiety and other symptoms of distress she experienced.

213.   Amazon promoted Dorsey to Station Manager in or around July 2021, just a few months after Ms. Sousa's complaint and the Company's sham investigation.

~~152.~~214.   Ultimately, Ms. Sousa's anxiety about returning to work with Dorsey and Amazon's falsely inflexible and retaliatory stance that she ~~would~~could not be permitted to seek a transfer until after she returned to work ~~led~~forced Ms. Sousa to seek other employment.  On July 7, 2021, Ms. Sousa notified Amazon that she was leaving her employment to work for a different company owned by Amazon.

215.   Ms. Sousa was so desperate to avoid returning to work with Dorsey and suffer additional harassment and retaliation that she left a $50,000 a year managerial job for a $15 an hour position with a different company.  She was willing to do anything she had to in order to

escape that coercive situation in which she could not even count on the Company's upper management or employee relations functions to take basic steps to provide her with a safe work environment, acknowledge inappropriate or offensive conduct, or address very reasonable employee concerns.

153.216.    Amazon's actions amountamounted to a constructive discharge of Ms. Sousa.

## VIII.   MS. SOUSA RECEIVES REPEATED HARASSING PHONE CALLS FOLLOWING THE CONCLUSION OF AMAZON'S SHAM INVESTIGATION

217.    The stress, anxiety and debilitating distress that Ms. Sousa was under to the extent that a refusal to allow her to transfer amounted a constructive discharge becomes all the more clear when it is revealed that Ms. Sousa also was subjected to anonymous, harassing phone calls for a time after the conclusion of Amazon's second sham investigation.

218.    At 2:06 PM on March 19, 2021, only about one hour after the conclusion of the call with Amazon's HR regarding the end and supposed findings of their investigation, Ms. Sousa received a call that appeared as "No Caller ID" on her phone.  She did not answer that call.

219.    At 4:56 PM, Ms. Sousa received a second call that appeared as "No Caller ID." Assuming the call was from Mr. Williams, Ms. Sousa answered and said, "Hello, Michael."  The voice on the other line, which sounded like Dorsey, responded, "Hello, Em.  Do you know who this is?"  A shock went through Ms. Sousa and she was paralyzed with fear—she could not believe someone was actually doing this to her.

220.    Shocked and not knowing how to respond, Ms. Sousa remained frozen in silence for a long moment.  When Ms. Sousa said that she did not know who was calling, the caller

stated, "Come on, you're killing me.  You really don't know?"  Ms. Sousa responded by saying,

"No, you're scaring me.  Who is this?"

221.    The caller continued to refuse to identify himself, instead offering to give Ms.

Sousa a hint and stating, "You don't want to guess?"  At this time, Ms. Sousa began to breathe

shakily and the caller hung up.

222.    On March 20, 2021, Ms. Sousa received three more calls like this one.

223.    The first call on March 20, 2021, was received at 10:37 AM.  Once again, the call

showed up as "No Caller ID," and the same man's voice was on the other end of the line.  When

Ms. Sousa asked who it was, the caller responded, "You didn't figure it out yet?"  Ms. Sousa

asked, "Do I know you?"  The caller responded, "Definitely."

224.    Ms. Sousa then asked, "Are you from work?"  At that point, the caller hung up.

225.    Ms. Sousa received another call from "No Caller ID" at 4:25 PM on March 20,

2021.  During this call, Ms. Sousa could hear heavy breathing on the other end of the line and the

caller hung up after 6 seconds without saying anything.

226.    Just one minute later Ms. Sousa received a call from "Unknown Caller."  When

she answered, it was the same voice on the other end from the previous calls.  The caller said

only, "Emily."  Ms. Sousa responded, "What do you want?"  The caller responded, "You know

what I want."

227.    The caller then repeated, "You know what I want."  Ms. Sousa then said, "What

do you want?  I'm curious."  After saying this, Ms. Sousa could hear the caller whispering to

someone, a door closing in the background and then the call hung up.

228.    The next morning, Ms. Sousa received two more calls from "No Caller ID."  The first, at 9:25 AM, she did not answer.  The calls showed no sign of letting up and it was taking a serious toll on Ms. Sousa.

229.    On March 21, 2021 at 9:37 AM, Ms. Sousa received another phone call from "No Caller ID" and answered with her father, Brian Sousa.  The caller asked Ms. Sousa, "Did you figure it out yet?"  Mr. Sousa responded forcefully, "I'm about to figure you out, buddy."

230.    Upon hearing Mr. Sousa's voice, the caller immediately hung up and Ms. Sousa did not receive any additional harassing phone calls.

231.    These calls caused Ms. Sousa's already fragile mental and emotional state to deteriorate further.  Her anxiety increased and she began to fear for her safety when out in public and at home.  For example, in public Ms. Sousa found herself frightened and always seeking to be aware of her surroundings due to feeling threatened and exposed after the terrifying calls.  At home, Ms. Sousa still felt uneasy and was always sure to make sure all of the doors were locked.  This increased stress caused her to start losing her hair.  This state of increased anxiety and hypervigilance lasted for about 6 months.

~~154.~~232.    Again, Amazon's retaliatory, false, cruel and pretextual refusal to allow Ms. Sousa to transfer work locations to get away from her harasser constituted a clear constructive discharge as she could not be expected to return to the same work situation, where her harasser worked and held sway (and whose harassment continued even after she told him she needed to resign or go on leave), and which had made her ill and necessitated her leave in the first place.

**FIRST CAUSE OF ACTION**
**(Race, Ethnicity, National Origin and/or Sex/Gender Discrimination ~~under~~ )**
**(Violation of Title VII of the Civil Rights Act of 1964)**
*Against Amazon.com, Inc. and Amazon.com Services LLC*

~~155.~~233.      Plaintiff hereby repeats, reiterates, and realleges each and every allegation in the preceding paragraphs, as though set forth fully herein.

~~156.~~234.      Defendants Amazon.com, Inc. and Amazon.com Services LLC have discriminated against Plaintiff on the basis of her race (Asian), ethnicity (Japanese), national origin (Japan) and/or sex/gender (female/woman) in violation of Title VII by subjecting her to disparate treatment of employment available to non-Asian, non-Japanese and male employees, including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories, and denying her the opportunity to work in an employment setting free of unlawful discrimination and harassment.

~~157.~~235.      These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

~~158.~~236.      As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

~~159.~~237.      As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical harm, and emotional distress for which she is entitled to an award of monetary damages and other relief.

~~160.~~238.      Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure

46

Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (~~Retaliation in~~ Sex/Gender Discrimination – *Quid Pro Quo* Sexual Harassment)
### (Violation of Title VII of the Civil Rights Act of 1964)
### *Against Amazon.com, Inc. and Amazon.com Services LLC*

~~161.~~239.   Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

240.   Defendants Amazon.com, Inc. and Amazon.com Services LLC's conduct constitutes *quid pro quo* sexual harassment in violation of Title VII in that, during the course of her employment, Plaintiff was subjected to unwelcomed sexual advances by her manager/superior/supervisor that were motivated by her gender.

241.   Plaintiff's repeated rejections of the unwanted sexual and romantic advances served as the basis for Amazon.com, Inc. and Amazon.com Services LLC's employment decisions concerning Plaintiff, as alleged herein.

242.   These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

243.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

244.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical harm, and emotional distress for which she is entitled to an award of monetary damages and other relief.

245.    Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Race, Ethnicity, National Origin and/or Sex/Gender Discrimination –
Hostile Work Environment Harassment)
(Violation of Title VII of the Civil Rights Act of 1964)
*Against Amazon.com, Inc. and Amazon.com Services LLC***

246.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

247.    Defendants Amazon.com, Inc. and Amazon.com Services LLC's conduct constitutes hostile work environment harassment in violation of Title VII in that, throughout the course of her employment, Plaintiff was subjected by her managers/superiors/supervisors and/or other employees to unwelcomed sexual advances and other inappropriate and offensive conduct on the basis of and/or which she was subject to because of her protected characteristics, and was denied terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories.

248.    The harassing conduct to which Plaintiff was subjected was severe and pervasive and created an environment that a reasonable person would consider intimidating, hostile, or abusive and enduring such harassment was a condition of Plaintiff's continued employment with Amazon.com, Inc. and Amazon.com Services LLC.

249.    Such conduct was motivated by Plaintiff's race, ethnicity, national origin, and/or gender/sex.

250.    These actions are in direct violation of Title VII of the Civil Rights Act of 1964, as amended.

251.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

252.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical harm, and emotional distress for which she is entitled to an award of monetary damages and other relief.

253.    Defendants' unlawful discriminatory and wrongful conduct constitutes a willful and wanton violation of Title VII, was outrageous and malicious, was intended to injure Plaintiff, and was committed with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of Title VII of the Civil Rights Act of 1964)**
***Against Amazon.com, Inc. and Amazon.com Services LLC***

254.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation as contained in each of the preceding paragraphs, as though fully set forth herein.

~~162.~~255.        By the actions described above, among others, Defendants retaliated against Plaintiff for complaining about, objecting to~~,~~ and resisting unequal treatment and harassment on the basis of race, ethnicity, national origin and/or sex/gender by, *inter alia*, forcing her to switch facilities, demoting her, subjecting her to further harassment, and subjecting her to retaliatory and discriminatory treatment that subjected her to stress, anxiety and pressure that forced her to go out

on medical leave, and constructively discharging her employment because of her engagement in protected activities protected under Title VII.

~~163.~~256.      As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

~~164.~~257.      As a direct and proximate result of the unlawful retaliatory conduct committed by Defendants in violation of Title VII, Plaintiff has suffered, and continues to suffer, severe mental anguish, physical harm, and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

~~165.~~258.      Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

**~~THIRD~~FIFTH CAUSE OF ACTION**
**(~~(~~Race and/or Ethnicity Discrimination ~~and Harassment in~~ )**
**(Violation of Section 1981)**
*Against All Defendants*

~~166.~~259.      Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

~~167.~~260.      Defendants have discriminated against Plaintiff on the "but for" basis and because of her race (Asian) and ethnicity (Japanese) in violation of Section 1981 by denying her the same terms and conditions of employment available to non-Asian and non-Japanese

employees (which would not have occurred if not for Plaintiff's Asian race and Japanese ethnicity), including, but not limited to, subjecting her to disparate working conditions, denying her terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories, and denying her the opportunity to work in an employment setting free of unlawful discrimination.

168.261.      Defendants have discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a discriminatory work environment that has included, among other things, severe and pervasive discrimination.

262.   As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish, physical harm, and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

263.    Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Race and/or Ethnicity Discrimination – Hostile Work Environment)**
**(Violation of Section 1981)**
***Against All Defendants***

264.    Plaintiff hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs, as though fully set forth herein.

265.   Defendants Amazon.com, Inc. and Amazon.com Services LLC's conduct constitutes hostile work environment and/or *quid-pro-quo* harassment in violation of Section 1981 in that, throughout the course of her employment, Plaintiff was subjected by her superiors/supervisors and/or other employees to near constant abuse and harassment including unwelcomed sexual advances that were based on her race (Asian) and Ethnicity (Japanese), and was denied terms and conditions of employment equal to that of her co-workers who do not belong to the same protected categories.

266.   The harassing conduct to which Plaintiff was subjected was severe and pervasive and created an environment that a reasonable person would consider intimidating, hostile, or abusive and enduring such harassment was a condition of Plaintiff's continued employment with Amazon.com, Inc. and Amazon.com Services LLC.

267.   Defendants have discriminated against Plaintiff on the basis of her race and ethnicity in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a discriminatory work environment that has included, among other things, severe and pervasive discrimination.

~~169.~~268.   As a direct and proximate result of Defendants' unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish, physical harm, and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, as well as physical injury, for which she is entitled to an award of damages and other relief.

~~170.~~269.        Defendants' unlawful and discriminatory actions constitute malicious, willful, and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants for the following relief:

A.        A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States;

<u>B.        Injunctive relief commanding Defendants to cease the unlawful actions, conduct and practices in which they have engaged under the laws of the United States;</u>

~~B.~~<u>C.</u>    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate Plaintiff for all monetary and/or economic damages;

~~C.~~<u>D.</u>    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's <u>physical harm and</u> emotional distress;

~~D.~~<u>E.</u>    An award of liquidated damages equal to the amount of Plaintiff's past and future lost wages;

~~E.~~<u>F.</u>    An award of punitive damages in an amount to be determined at trial;

~~F.~~<u>G.</u>    Prejudgment interest on all amounts due;

~~G.~~<u>H.</u>    Post-judgment interest as may be allowed by law;

~~H.~~<u>I.</u>    An award of Plaintiff's reasonable attorneys' fees and costs; and

~~I.~~<u>J.</u>    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demand a trial by jury on all issues of fact and damages stated herein.

**ALLEN & ASSOCIATES**

/s/ *Michele D. Allen*
Michele D. Allen (#4359)
Emily A. Biffen (#6639)
4250 Lancaster Pike Suite 230
Wilmington, DE 19805
(302) 234-8600
(302) 397-3930 (fax)
michele@allenlaborlaw.com
emily@allenlaborlaw.com

Of Counsel:

Lawrence M. Pearson, Esq.
Anthony G. Bizien, Esq.
Admitted *Pro Hac Vice*
Wigdor Law LLP
85 Fifth Avenue, Fifth Floor
New York, NY 10003
Phone: (212) 257-6800
Facsimile: (212) 257-6845
lpearson@wigdorlaw.com
abizien@wigdorlaw.com
*Attorneys for Plaintiff*

Dated: January 12, 2022